Let's just wait one second, I think we're losing our Nestle Plus M people, but thank you for your patience, Ms. Franklin-Best, you have reserved two minutes for rebuttal. Yes, Your Honor. So that gives you eight minutes, you may proceed. Thank you. Good morning, Your Honors, and may it please the Court. I am Elizabeth Franklin-Best, and I represent Mr. Rafael Frias. The District Court improperly applied the enhancement for being a leader or organizer of the criminal conduct in which he participated. Specifically, it was error to enhance Mr. Frias's sentence with a four-level enhancement based on the participation of his sister and his mother. Can I just interrupt you for a second? So you're not disputing manager or supervisor, but you're saying organizer and leader is a bridge too far. I believe that there may be an argument for some leadership role. I think it's important in this case that he received- It seems to me in the District Court, there was no dispute that it should be three levels, right? He received a four-level enhancement. I know he received a four, but it didn't seem that there was any, in the argument, the defense counsel said it should be three. Am I wrong about that? I believe that may be what counsel argued, Your Honor. Your Honor, I think that any enhancement, frankly, is inappropriate based on the record in this case. If you review, as the District Court did, the social history developed by the Center for Community Alternatives, it's clear that Rafael's mother is largely responsible for getting him into this line of work in the first place. His mother, his grandmother were drug dealers in their own right. By the age of 12, Rafael was dealing drugs to support his family. For two generations, drug dealing has been a family enterprise. When he was 14, his grandmother put him out on the street to sell his own drugs. So the idea that this case is more aggravated and deserving of an enhancement because he enlisted others, frankly, does not comport with reality of the situation, Your Honors. In addition, to the extent that the government relies on what it characterizes as the subcontractors, that claim does not hold water either. Well, the District Court didn't rely on that, right? No. The District Court basically just adopted what's in the PSR, and the subcontractor information is not in the PSR, right? I believe that there was an argument about the subcontractors in that PSR. I could be mistaken, Your Honor. It is clear that the court, in giving this enhancement, this four level enhancement, did so based on this idea that he was exercising some authority and control over people. And that is sort of the point that I'm pushing back on, Your Honors. He did not control them. He requested that they perform certain acts, and they did so. This is simply how the family operated and had operated for two generations. So this is far from a case where there would have been, say, like an implicit threat of violence if somebody had stepped out of line. That is the kind of conduct that is deserving of enhancement. What happened here is just a mine run drug distribution case. But the District Court treated it as something particularly nefarious. It is particularly tragic. But Raphael is not deserving of an enhanced sentence as though he were threatening or coercing other people to engage in conduct that they would not have otherwise engaged in. But threats and coercion are not required for enhancement. Well, but authority and control is, Your Honor. And that is the piece that is missing. I mean, there has to be some mechanism by which that authority, that control is exercised. And Raphael may have asked his mother, his sister, to engage in some conduct. He may have. There's no dispute that he asked them to do it, right? He did, on a couple of very discreet occasions, Your Honor. Was it at least three, right? I'm sorry? It's at least three over the course of, what, a couple of months? Well, I think it was probably ongoing much longer than that. But again, this is the kind of conduct that they were otherwise willing to engage in, Your Honor. He was not enlisting them to do something that they were not otherwise doing. But that isn't necessary. I mean, if he was directing them, go get this brick and deliver it here and bring it to me there, that still is direction. And you don't need coercion. This isn't that kind of crime. I mean, this is an enhancement. But there is, I understand, Judge Carney. I would just say that in order to exercise control over somebody, I mean, implicit in that phrase is some consequence if something doesn't happen. I mean, I think when we're looking at enhancements, we're looking for something that takes it out of a regular mine run case. And- But in your view, then, anybody who enlists a family member to do something for out, not for pay, wouldn't be subject to an enhancement. That's not accurate, Your Honor. I mean, in this particular case, where you have a mother, a grandmother- You said there has to be some consequence to saying no. And so that seems to me the consequences are either threat or reward, or the withholding of a reward. I think that's accurate. If there's no rewards and no threats, then you're saying that there can't be an enhancement. Well, there cannot be sort of authority and control. But I mean, yes, Your Honor, I am saying that. I mean, I think that it is something more than the mine run case. I mean, I think Congress sort of spoke when it said, here is the kind of penalty that we want for this amount of drugs. But recruitment is one of the factors that's listed in the application, right? I'm sorry, Your Honor? Recruitment is one of the factors listed in the application note to discern whether or not there's an enhancement. And Your Honor, I would say that recruitment here was lacking. I mean, this is the kind of conduct that this family was engaged in for two generations. Did he recruit his mother and his sister? They were already dealing drugs, Your Honor. This is, again, he did not recruit them. He asked them to engage certain acts, but this was not the kind of authority and control that Congress intends to use to enhance his sentence. The same is the case for the Stash House. I mean, again, this is where his mother lived. The fact that there were some drugs in that home does not mean that he had created a stash house for purposes of distributing the drugs. You don't have to create a stash house, you just have to basically maintain it. He did not keep it for purposes of maintaining a stash house. I mean, its primary purpose was to provide shelter for his mother. That incidentally, there were some drugs in that home that he would then distribute outside of that home. It's not really incidental. He admitted that he often stored fentanyl there and conducted numerous drug transactions just outside after receiving fentanyl from inside the residence. I mean, the word primary is used, but it doesn't have to be, it has to be significant usage, not really the use that outstrips all the others by a significant factor, right? And it is true, yes, Your Honor. And it is true that he was using some portion of the house. I believe it was inside of a cupboard or something like that where he was keeping the drugs. But he was primarily distributing those drugs outside of those premises. The primary use of that premises was for his mother and for the shelter. But you agree that a significant use was for storage of this fentanyl, right? I guess I disagree with the characterization of the significant. I believe it was an incidental sort of use of that property that was primarily for purposes of providing shelter for Raphael's mother. Sir, lastly, well, I see I've got five seconds if I could- No, that's okay. No, go ahead. Just briefly, I think the district court erred in failing to meaningfully consider his extraordinary mitigation. I think that his life story is kind of particularly tragic and difficult. But the district court acknowledged that, right? It seems to me you don't think the district court gave it sufficient weight. The district court clearly acknowledged his traumatic childhood. And I do agree that the district court judge did not provide it significant weight, Your Honor. But we generally don't second guess district courts when they're weighing factors, right? Not typically, but I do think that this is sort of an extraordinary case of mitigation. And for the district court judge to merely sort of recognize the trauma without really exploring what he's been doing lately in order to sort of move beyond this, I think was a flaw in the case. And I think it improperly resulted in a higher sentence that he should have received. And if I could reserve my two minutes for rebuttal, thank you. All right, thank you. We'll now hear from Mr. Sutcliffe. Good morning. May it please the court, Thomas Sutcliffe on behalf of the United States. The district court here correctly applied a four level enhancement based on the defendant's role in the offense. And it did not commit plain error, either in its application of a two level premises enhancement or in its consideration of the mitigating- Let me start with the role, because this does seem a little heavy handed. I mean, this is a guy who basically on three occasions asked his mother or his sister to do things for him at the residence while he was not there. Is that my, am I characterizing this correctly? Your Honor, I think that, yes, that is correct. It was three instances in an approximately three week period that occurred in June of 2021. In your view, that makes him an organizer and leader of criminal activity? Yes, Your Honor, and I think the nature of that relationship here meets several of the criteria that the commentary to the guideline sets out as being relevant. So one is, I think the court alluded to earlier, Frias did admit in his proceedings below that he recruited both of them into the- Well, he recruited them in the sense that he asked them to do this favor, right? He did, yes, he recruited- Any time you ask a favor, then you've recruited, and any time you ask somebody to do you a favor, you are an organizer and leader? Well, Your Honor, in addition to the recruitment, there's also the control, he exercised decision making authority. These were all his transactions. But look, okay, but if he did it himself completely, right, and didn't need to call in any favors because he was, for the three week period, he was there himself. Then he wouldn't be getting an organizer or leader enhancement, right? Your Honor, if they weren't involved at all, I do agree with that. But I think there's other addition in the record here that suggests that they were more deeply involved than simply a sporadic or occasional request. So for example, there's the frequency with which he's doing this, three times in approximately three weeks, that suggests that this is not a sporadic event. In addition to that, if you look at the calls between Frias and his mother, in particular the two that are transcribed in the record, they're noticeably short and they're noticeably to the point. Both of them essentially have the mother saying, someone's here, and then he quickly gives her instructions on what to do next. And he also seems very comfortable using shorthand references with her, including the fact that he uses the phrase Lagrassa, which refers to a stamp that appears on a very specific fentanyl product that he's selling. What I think all that suggests is that this is not the mother's first time doing it. I think an extrapolation can be made here. Anything to indicate that she was on the payroll, that this was part of an organization, that it was a family business? Your Honor, I don't think there's any indication that she received compensation, but 3D1.1 does not have an exception for family members. It doesn't require compensation. It certainly doesn't require any overt use of force. In fact, the drug guideline 2D1.1 actually includes an enhancement for- I mean, it calls for assessing a number of factors, including the degree of control and authority exercised over others. So he asked his mother to do this, and if she said no, what? Your Honor- She'd be fired? I don't know that there has to be an explicit punishment in here. I mean, the fact is- But what does it mean to control and exercise control and authority over others? I think it means that someone directs another person to do it, and they do it. They comply, which every time the mother here did. And I think that makes sense because a conspirator can exercise control in a relationship by manipulating bonds of affection just as easily as he could do so with threats of force or financial incentives. In fact, the drug guideline 2D1.1 actually has an enhancement for defendants who are eligible for a role enhancement and who use affection to involve other people in conspiracy. It just seems strange that a guy who is pretty much a single operator, right? He's basically a middle man who is distributing fentanyl. He gets from a source and he's selling it to other folks who distribute. That if he happens to ask a couple of people for favors, he's all of a sudden getting a four level bump and is an organizer or a leader. But if he's self-sufficient, or just happens to be self-sufficient on the three week period that there's a wire tap up, then he's not. Well, Your Honor, again, I think if he's doing it with sufficient regularity, and again, the nature of these calls suggests that this is not a one-off event. That these were routine occurrences that were happening over and over. Well, routine, there's only three, right? There's only three that were captured during the wire, Your Honor. But when you have calls where the- There's no records that show that mom is on the payroll as is sis. I mean, there's nothing like that. So, I mean, you're asking us to expect, because three in three weeks, we are to infer that this happened every week for a year? Your Honor, I think in three calls, when you have transactions where he's able to, where these transactions happen as quickly as they do, where the mother appears to be conversant to the language of the conspiracy, so much where he simply has to refer to a stamp that appears on drugs, and she immediately knows what he's referring to. I think, Your Honor, one can infer that this is a more permanent relationship than simply a more casual or a more sporadic request for assistance. And what makes it an organizer or leader as opposed to a manager or supervisor? Your Honor, I think it again comes down to the factors that are listed in the commentary, which- So how would the manager ones apply, and how would the organizer ones apply on facts like this? Your Honor, at least for the organizer, leader, and factors, we have the recruitment of accomplices. These are people, by his admission, who only came into the conspiracy. These are basically the factors for both, right? Those are the factors for distinguishing them. I take the factors to mean that if you recruit accomplices, that makes you more likely a leader than a manager or supervisor. I think that's the goal of the factors. If you trigger those factors, that takes you to the higher prong. We do have the recruitment here. We also have the fact that, again, the level of the control and the authority. I think- But by that, I mean, so recruitment of accomplices as opposed to just supervising who's been supplied by others? Is that what you mean? That's the difference? I think recruitment means that if somebody was not involved in conspiracy but for the actions of the defendant, that would be recruitment as opposed to somebody who's simply a smaller player in a conspiracy, and the actors are kind of predetermined by somebody else. Again, you have the level of control and authority. This court has said before that the less discretion that you afford, the more control you exercise over someone is another indicia of being a leader or organizer. Here, the level of control Freest directs, I mean, it's to the point where he has to tell his mother what drawer to find the drugs in. There's- Yeah, I mean, that's all consistent with sort of doing a favor, so. Well, again, it's an example of control. There's also a call where he appears to be directing her to immediately return proceeds to her. It's another example of the lack of discretion that he's affording the accomplices, and that goes to the control component. Your Honor, I also want to mention that there's a second prong on which the court can affirm the 3B1.1A enhancement, and that is based on his control of the sub-distributors here. So how do they control the sub-distributors? Again, Your Honor, I think it goes to the level of control that he exercised. What, because he told them what to do with product that they were complaining about? Well, it was not just- Any supplier is going to be in that situation. I think the more salient calls are the ones where he specifically tells the sub-distributors how to go about mixing and diluting fentanyl, particularly for the purpose of maximizing the profitability of the enterprise. There's a number of calls with at least two sub-distributors where he's giving them not only very detailed instructions on how to prepare and package and dilute fentanyl, but he's also checking in with them quite frequently. He calls them back and asks them if they did as they were instructed, and if the fentanyl came out correctly. And I think that's an example that takes us outside of the conventional buyer-seller transaction. Why? What were the consequences if they didn't do it, right? I mean, it seems to me that they could either not buy from him again, or he could not sell to them again. But that strikes me as would be true of any situation in which a wholesaler is selling to distributors. Your Honor, I don't know that there has to be an explicit punishment that's defined in the conspiracy. The fact is, he tells them what to do, and they appear to comply with it. And they also appear to be apologetic when they don't do as they're instructed. There's at least one call with the sub-distributor who's identified as FL, where Frias tells him that he did it incorrectly. And FL's response is something to the effect of, don't worry, that's not going to happen again. I think the more relevant characteristic here is that there are lines of accountability. And that's much more akin to an employer-employee relationship than just a purely commercial arm's length transaction. Could I? Go ahead, no, please. If you're done answering Judge Sullivan's question, I'd like you to take a little time to address the drug premises enhancement. Because I'm concerned that the position the government's taking suggests that any time anyone keeps any drugs at all, anywhere, regardless of any residential purpose or other usage of the property, that the drug premises enhancement will apply. And in any drug operation, you have to keep your product someplace. So, I mean, the application note suggests that we look to knowingly maintaining a building, a room, or enclosure, like a closet or a trash bin. For the purpose of manufacturing or distributing, including storage. So is there a case in which a drug dealer would not have a maintaining drug premises enhancement? Yes, Your Honor, I think there is, and the best case I would point to is the McDowell decision. It's a decision from this case, albeit an unpublished one. Yes. Where they found maintenance based in part on the defendant's unrestricted access to the property, which I think bears a parallel to this case. But ultimately it found that the defendant's use of that property was too transient, or the drugs that were being possessed there were too transient. In part because- A small amount, and there was a residence, and the person lived there in the mother's residence. That's correct, yes. A little bit. Yeah. So what do you look at, or how do you interpret that? I mean, that's a relatively unusual opinion that's unpublished. So is it the transients? I mean, he had access, and the government was taking a contrary position, of course. Your Honor, I think the distinguishing factors there are, one, the transient was based, as my recollection, partly on the fact that the only drugs were found in his pocket, which suggests that it wasn't the drugs weren't going to stay there very long. Also, there were no history of transactions occurring at the residence, which is also a factor. A history of transactions is, I think, a factor that this court- There was coverage of some amount inside, and the inside was a residence. Your Honor, yes, but as the PSR states, there are transactions occurring frequently at the residence. It's not clear if it's outside or necessarily in the residence. Well, wouldn't it be because there's two undercover purchases, right? There are a total of four controlled purchases in Defrius, two of which occurred at the Merriman residence. At the residence, meaning inside or in front? I don't know the, I think it's outside, Your Honor. I don't know the exact location. That's before the wiretap begins. The PSR also describes transactions occurring frequently at the Merriman residence, and sometimes even on a daily basis. And regardless of whether they're in the residence or not, it's undisputed that he's supplying them with drugs that he's keeping there. And I think that's what, I certainly agree that an incidental use of a property is not going to qualify. But if you have a property that's being used nearly on a daily basis to supply customers, that's what takes this out of that more- The note says primary, right? And the word primary has been used regularly. But that doesn't seem to be the government's position generally. It's if you, on a more than transient basis, use the premises to store some amount of drugs. Would that be the government's position that that warrants the enhancement? Your Honor, I think primary is the correct term. I would just note that the guidelines do make clear that you can have more than one primary purpose for using a residence. So I think, and in terms of how you evaluate that, I think again, the number of transactions that are occurring at a property is a factor that the case has come up in the case law. It's one of the factors that this court in the Manalis decision- At meaning inside? I'm sorry? At meaning inside? I think it could be at, it could be outside. So I think the ultimate question I think that we're trying to resolve is how important is this property to the overall drug conspiracy? And if it's a location where someone is storing drugs and then conducting sales in close proximity to that property, and if they're doing it on a near daily basis, I think that supports, at least certainly on plain error review. So you look to the drug conspiracy and its total operation as the kind of basis for determining significance rather than to the use of the premises? I think that's right. Several other, this circuit hasn't- So if you live in a building, multifamily building, and you keep a small amount, but regularly keep a small amount there for your own transactional purposes. That's probably enough to maintain a drug premises to have that enhancement. I think if there's a frequent enough transactions as there is here, that would be sufficient. I'll also note, if I may, this issue of how do you apply the enhancement to residences? This court hasn't dealt with that issue very much. Several other courts have, among them the sixth, the seventh, the eighth, and the tenth. And the government actually addresses this issue a bit more in connection with one of Frias' co-appellants, Carlos Esteros. And what those courts have typically said is that when you're dealing with a residence, you don't have to engage in a purely mathematical analysis. In other words, you don't have to create a ledger and count up all the hours that he's using it for family purposes versus all the hours that he's using it for drug purposes. Instead, these courts have adopted a more functional approach, where you do ask this question of how central of a role did this property play in the overall conspiracy? And among the factors that go into that, I think, are the amount of drugs seized, again, the amount of transactions. Another factor that this court identified in the McDowell decision was, is drug dealing the defendant's primary source of income? If it isn't, then that leans against application. If it is- It also seems that the transactions are taking place at the residence when he's not there. In other words, he's not the locus of the sales, the property is the locus of the sales. I think that's correct, Your Honor. And the fact that he has to rely on other people to assist him, I think that speaks to just the frequency and the volume of transactions that are taking place. Possessory interest, you just say, as long as the person had free access, even though he didn't rent or own or control the premises, as long as he had free access, something like that? I think that's sufficient, because the guidelines commentary does say that possessory interest is only one factor. Another relevant factor is the level of control that the defendant exercised over either access to the property or activities occurring at the property. And that makes sense. Drug activities. Drug activities. Certainly that. And I think that makes sense, because otherwise, were it any narrower than that, were it limited to just the possessory interest, virtually any drug distributor could avoid additional punishment simply by basing their operation out of the home of a friendly third party, which is function- But of course, it also means that basically every regular drug dealer will have a drug premises enhancement, because you have to keep your stuff someplace. Your Honor, not necessarily, I don't think. I mean, it's really going to depend on how much is being stored at that particular property. I think it's going to depend on how much is being stored at that residence. I don't know that, again, we do have this second factor above and beyond maintenance, which requires that at least a primary purpose of the property be distributing controlled substances. And that's where we sort of get into the totality of the circumstances test. But again, if it's a small amount or if that property is only used on a casual basis, I don't think that the enhancement would qualify under those circumstances. Unless the court has any further questions, the government asks that the judgment be affirmed in its entirety. Thank you. Thank you. We'll now hear from Ms. Franklin Best for two minutes every month. All right. Thank you, Your Honors. The government advocates for a very broad application of the leader-organizer enhancement. Merely asking and they comply would be sufficient for the government to find that this enhancement applies. But that's going to be present in nearly every business venture. And that's not what enhancements are for. The same is, if I could just sort of briefly talk about the distributors claim. When these conversations were happening, when Raphael was talking to these so-called sub-distributors, I think it's important to note that what they were discussing were profiting for those sub-distributors. Not increasing Raphael's profit. I mean, really the content of these conversations appear more to be kind of drug-dealing hacks than any kind of way of bringing in more money into the organization. I would also note that Sash House is also likewise overbroad. There was no evidence in this record that these transactions were more than transient. There was no possessory interest, there was no control over that. It did belong to his mother. We have a really sort of short period of conspiracy that's alleged in this case. And so the record just isn't there to show that there is this pervasive use of this home for purposes of maintaining drugs. And in fact, what is in the record suggests that it was- The application notes don't say it has to be pervasive, right? It does not have to be pervasive, but it has to be in principle. It's gotta be a main reason. One of the primary purposes. One of the primary purposes. Is there any other location that he seemed to be using to store drugs? I mean- It seems to me he used that location even when he wasn't there. But again, I mean, the record does not reveal where else. We know that he was living somewhere else, so, but we don't know what- I don't think there's any dispute, right, that he often stored fentanyl here. But there was, well, there was fentanyl there for sure. Well, but I mean, I think that's in the pre-sentence report. They state that he often stored it there. He regularly engaged in hand-to-hand sales there. He directed his mother and sister to facilitate sales at that location when he wasn't there. And then multiple bundles of envelopes and quantities of fentanyl were found at the residence. And to be clear, we're not disputing that there was some drug activity at that location. It's whether or not- It just seems that all that taken together is enough to support that this was, in fact, a stash house. That's what he was using it for. But again, I think it's important to kind of look at the purposes of the enhancements. And in this case, it really overstates Raphael's culpability. I mean, there's no question that he was engaged in dangerous behavior, Your Honor. Well, but the whole point, one of the points is that we don't want children and other people coming across this stuff, right? Absolutely, Your Honor. So using a residence is right down the middle of the fairway for why we have a stash house. But when we're looking at these enhancements, we're looking for something that really sort of aggravates the case from the sort of mind-run drug distribution case. And in this case, Raphael received an additional six points enhancing his sentence based on conduct that was really quite incidental to the activity that he was engaged in. And so that's sort of the crux of the issue here. Not that he's not entitled to be or that he shouldn't be punished for his conduct. I mean, he clearly should have been. But he received a much greater sentence based on this kind of conduct that was really quite incidental to what he was participating in. But again, they're two separate enhancements. Yes. I don't think they can be conflated. The two level for a stash house seems to me to be less of a close call than the organizer or leader. That's what's doing most of the work here, right? That's a four level bond. The organizer or leader. Yes. That's absolutely correct, Your Honor. And so the government's view seems to be that you recruit somebody, you recruit a family member, and all of a sudden you're an organizer or a leader. That's exactly right. Which is, that does seem aggressive. On the other hand, the other factors don't provide that much guidance. Claimed right to a larger share of the fruits of the crime. I guess he wasn't sharing it with his sister or mother, so his share of the crime was bigger than theirs, but it didn't get any bigger because of the relationship. But the other factors, I'm not sure how they really float in this case. Anything else you want to say on that point? No, Your Honor. There are no additional questions. All right. Well, we will reserve decision. Thank you both.